CR 20-00425-EJD

# United States District Court

FOR THE

**NORTHERN DISTRICT OF CALIFORNIA**

VENUE: SAN JOSE

**SEALED BY ORDER OF THE COURT**

**FILED**

May 18 2021

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

UNITED STATES OF AMERICA,

V.

MARK SCHENA,

DEFENDANT(S).

---

# SUPERSEDING INDICTMENT

18 U.S.C. §§ 1349 - Conspiracy to Commit Health Care Fraud
18 U.S.C. § 1347 – Health Care Fraud
18 U.S.C. § 371 – Conspiracy to Pay Illegal Kickbacks
18 U.S.C. § 220 – Payment of Illegal Kickbacks
15 U.S.C. §§ 78j & 78ff;
17 C.F.R. 240.10b-5 – Securities Fraud;
18 U.S.C. §§ 981(a)(1)(C) & 982(a) & 28 U.S.C.
§ 2461 – Criminal Forfeiture

---

A true bill.

/s/ Foreperson of the Grand Jury

Foreman

Filed in open court this ___18th___ day of May, 2021

_____.

Clerk

Bail, $ ___No Process___

Hon. Thomas S. Hixson, U.S. Magistrate Judge

FILED

May 18 2021

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

SEALED BY ORDER OF THE COURT

STEPHANIE HINDS (CABN 154284)
Acting United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

WILLIAM FRENTZEN (LABN 24421)
Assistant United States Attorney

DANIEL KAHN (NYBN 4196413)
Acting Chief
U.S. Department of Justice, Fraud Section

JACOB FOSTER (CABN 250785)
JUSTIN WEITZ (NYBN 5027966)
Assistant Chiefs
U.S. Department of Justice, Fraud Section
950 Pennsylvania Avenue NW
Washington, DC 20005

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> MARK SCHENA, <br><br> Defendant. | Case No. CR 20-00425-EJD <br><br> <u>VIOLATIONS</u>: 18 U.S.C. § 1349 – Conspiracy to Commit Health Care Fraud and Wire Fraud; 18 U.S.C. § 1347 – Health Care Fraud; 18 U.S.C. § 371 – Conspiracy to Pay Illegal Kickbacks; 18 U.S.C. § 220 – Payment of Illegal Kickbacks; 15 U.S.C. §§ 78j & 78ff; 17 C.F.R. 240.10b-5 – Securities Fraud; 18 U.S.C. §§ 981(a)(1)(C) & 982(a) & 28 U.S.C. § 2461 – Criminal Forfeiture <br><br> SAN JOSE VENUE    <u>FILED UNDER SEAL</u> |

SUPERSEDING I N D I C T M E N T

The Grand Jury charges:

<u>Introductory Allegations</u>

SUPERSEDING INDICTMENT                                       1

1. The defendant Mark Schena ("SCHENA") resided in the Northern District of California and served as the President of Arrayit Corporation ("Arrayit"). Schena described himself as the "Father of Microarray Technology."

2. Arrayit was a publicly traded medical technology company incorporated in Nevada, and based in Sunnyvale, California. Arrayit described itself as "a world leader in microarray technology empowering researchers and doctors in the life sciences, wellness and healthcare testing markets." Arrayit was a participating provider in the Medicare, Medicaid, TRICARE, and other health care benefit programs, and submitted or caused the submission of claims to Medicare, Medicaid, TRICARE, and other health care benefit programs.

3. Shares of Arrayit stock were traded "over the counter" (OTC) using the ticker symbol "ARYC." As a security traded OTC, individuals, entities, and other investors were able to buy or sell Arrayit shares.

### Arrayit's Communications with Investors

4. Since 2015, Arrayit communicated with investors using a number of methods and means. Arrayit ceased filing formal quarterly reports (Form 10-Qs) with the Securities and Exchange Commission ("SEC") in 2015, but continued to communicate with investors using press releases, email, and Twitter, a social media platform accessible to the public. SCHENA was the primary person at Arrayit responsible for communicating with investors.

5. Arrayit opened its Twitter account in 2009, and until approximately mid-2019, SCHENA posted frequently on a Twitter account identified with the username @arrayit.

6. SCHENA would often bunch Arrayit tweets together, so that Arrayit posted multiple tweets per day. Many of SCHENA's tweets adopted a journalistic tone, noting that Arrayit sales teams were "report[ing]" on a topic of interest related to the company, and used stock photos unconnected to Arrayit's actual business.

### The Medicare, Medicaid, and TRICARE Programs

7. The Medicare program ("Medicare") was a federally-funded health care program that provided benefits to persons who were at least 65 years old or disabled. Medicare was administered by

the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services ("HHS").

8.  The Medicaid program ("Medicaid") was jointly funded by the federal and state governments and was a program that provided health care benefits to certain low-income individuals and families in states. Medicaid was administered by CMS and various state agencies.

9.  The United States Department of Defense, through the Defense Health Agency, administered the TRICARE program ("TRICARE"), which was a comprehensive health care insurance program that provided health care benefits to United States military personnel, retirees, and their families.

10. Medicare, Medicaid, and TRICARE were each a "Federal health care program" as defined in Title 42, United States Code, Section 1320a-7b(f), and a "health care benefit program" as defined in Title 18, United States Code, Section 24(b).

11. Individuals who received benefits under Medicare, Medicaid, and TRICARE were referred to as "beneficiaries."

12. Diagnostic testing laboratories, physicians, clinics, and other health care providers, all of which provided services to beneficiaries, were able to apply for and obtain a "provider number." A health care provider that received a provider number was able to file claims with Medicare, Medicaid, and TRICARE to obtain reimbursement for services provided to beneficiaries.

13. To participate in Medicare, Medicaid, and TRICARE, providers were required to submit an application in which the providers agreed to abide by the policies and procedures, rules, and regulations governing reimbursement. To receive funds, enrolled providers, together with their authorized agents, employees, and contractors, were required to abide by all provisions of the Social Security Act, the regulations promulgated under the Act, and applicable policies, procedures, rules, and regulations issued by CMS, relevant state and federal agencies, and authorized agents and contractors. Health care providers were given and provided with access to manuals and services bulletins that described proper billing procedures and billing rules and regulations.

14. A health care provider who was assigned a PIN and provided services to beneficiaries was able to submit claims for reimbursement that included the PIN assigned to that medical provider. Payments were often made directly to a provider of the goods or services, rather than to a beneficiary.

This payment occurred when the provider submitted the claim for payment, either directly or through a billing company.

15.     Medicare, Medicaid, and TRICARE regulations required health care providers to maintain complete and accurate patient medical records reflecting the medical assessment and diagnoses of their patients, as well as records that documented actual treatment of the patients to whom services were provided and for whom claims for payment were submitted by the physician.  Medicare, Medicaid, and TRICARE required complete and accurate patient medical records so that Medicare, Medicaid, and TRICARE would be able to verify that the services were provided as described on the claim form.  These records were required to be sufficient to permit Medicare, Medicaid, or TRICARE, or their contractors, to review the appropriateness of payments made to the health care provider.

16.     Medicare, Medicaid, and TRICARE paid for claims only if the items or services were medically reasonable, medically necessary for the treatment or diagnosis of the patient's illness or injury, documented, and actually provided as represented to Medicare, Medicaid, and TRICARE. Medicare, Medicaid, and TRICARE would not pay for items or services that were procured through kickbacks and bribes.

Commercial Insurance Plans

17.     Commercial insurance plans were provided by private health insurance companies ("Commercial Insurers") that offered individual and group health benefit plans under which individuals could obtain coverage for health care items and services.  Individuals who received benefits from Commercial Insurers were referred to as "members."

18.     Each of the Commercial Insurers was a "health care benefit program" as defined in Title 18, United States Code, Section 24(b) and Title 18, United States Code, Section 220(e)(3).

19.     Commercial Insurers often made payments directly to laboratories and other providers, rather than to members who received the health care benefits, items, and services.

20.     To obtain payment for treatment or services provided to a member, laboratories and other providers were required to submit itemized claim forms to the member's commercial insurance plan. The claim forms were typically submitted electronically.  The claim form required certain important information, including: the member's name and identification number; a description of the health care

SUPERSEDING INDICTMENT                         4

benefit, item, or service that was provided or supplied to the member; the billing codes for the benefit, item, or service; the date upon which the benefit, item, or service was provided or supplied to the member; and the name of the referring physician or other provider, as well as the applicable identification number for the referring physician or provider.

21. When a provider submitted a claim to Commercial Insurers, the provider certified that the contents of the form were true, correct, complete, and that the form was prepared in compliance with applicable laws and regulations. The provider also certified that the items or services being billed were medically necessary and were in fact provided as billed.

Diagnostic Testing

22. CMS regulated all laboratory testing (except research) performed on humans in the United States through the Clinical Laboratory Improvement Amendments (CLIA). All clinical laboratories seeking reimbursement were required to be properly certified by CLIA and state regulatory agencies.

23. Examples of clinical laboratory testing included the following:

   a. Allergy testing: Allergy referred to conditions in which immune responses to environmental antigens caused tissue inflammation and organ dysfunction. Allergy testing was performed to determine immunologic sensitivity or reaction to antigens for the purpose of identifying the cause of the allergic state.

   b. COVID-19 antibody testing: COVID-19 antibody testing was a test for antibodies in the blood to determine whether an individual was previously infected with the novel coronavirus disease 2019, commonly referred to as "COVID-19." COVID-19 antibody testing would not reliably diagnose a current COVID-19 infection.

24. Medicare did not cover diagnostic testing, including allergy and COVID-19 antibody testing, that was "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." Title 42, United States Code, Section 1395y(a)(1)(A). Except for certain statutory exceptions, Medicare did not cover "examinations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint or injury." Title 42, Code of Federal Regulations, Section 411.15(a)(1).

SUPERSEDING INDICTMENT         5

25. If diagnostic testing was necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, Medicare imposed additional requirements before covering the testing. Title 42, Code of Federal Regulations, Section 410.32(a) provided, "All diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem[,]" and "[t]ests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." Title 42, United States Code, Section 1395l(h)(5) provided that payments from Medicare for covered clinical diagnostic laboratory tests may be made only to "the person or entity which performed or supervised the performance of such test."

26. Medicare, through its contractors, and Commercial Insurers set forth rules and regulations regarding the circumstances in which allergy testing was reasonable and necessary. One type of allergy testing was "in vivo," which correlated the performance and evaluation of selective cutaneous and mucous membrane tests (commonly referred to as "skin tests") with the patient's history, physical examination, and other observations. Another type of allergy testing was a test for allergy hypersensitivity "in vitro" (commonly referred to as "blood tests"), which measured allergen-specific serum IgE. Percutaneous skin testing was the test of choice in most clinical situations where immediate hypersensitivity reactions were suspected. Overall, skin testing was quick, safe, and cost-effective.

27. Under certain limited conditions, in vitro testing was medically necessary. Quantitative (measuring the amount of sensitivity) in vitro allergen specific IgE testing was medically necessary under conditions where skin testing was not possible or was not reliable. Examples of indications for in vitro testing would include patients with severe dermatographism, ichthyosis, or generalized eczema. In vitro testing is significantly more expensive than skin testing.

28. It would not be medically necessary to test all patients for the same number of allergens. The number of allergens that are tested for was required to be judicious and related to the history, physical findings, and clinical judgment specific to each individual.

The Scheme to Defraud

29. Beginning in or around 2015, and continuing through in or around 2020, SCHENA,

SUPERSEDING INDICTMENT  6

together with others known and unknown to the Grand Jury, engaged in a fraudulent scheme to obtain money and property by: (a) deceiving purchasers and sellers of Arrayit's securities, and the market at-large, about the performance of Arrayit's business, Arrayit's financial condition, the nature and composition of Arrayit's products, Arrayit's sales, revenues, and expenses, and Arrayit's prospects for growth; and (b) deceiving Medicare, Medicaid, TRICARE, and Commercial Insurers about insurance claims that SCHENA and his co-conspirators caused to be submitted to Medicare, Medicaid, TRICARE, and Commercial Insurers.

30. The purposes of the scheme to defraud were, among other things: (a) to promote Arrayit and SCHENA online and in public by overstating its status and influence; (b) to enrich SCHENA and Arrayit by increasing the company's value and receiving additional revenue from Medicare, Medicaid, TRICARE, and the Commercial Insurers; and (c) to artificially increase and maintain the share price of Arrayit securities to, among other things, make Arrayit attractive to potential purchasers.

31. It was a part of the scheme that SCHENA and others used a variety of manners and means, including, among others:

    a. Failing to provide investors and the SEC with accurate financial statements and reports of Arrayit's financial condition;

    b. Concealing Arrayit's financial condition by falsely promising that the public release of Arrayit's financial statements was imminent;

    c. Making false and misleading statements to investors about the performance of Arrayit's business, Arrayit's financial condition, the nature and composition of Arrayit's products, Arrayit's sales, revenues, and expenses, and Arrayit's prospects for growth;

    d. Making false and misleading statements to investors about the proliferation of Arrayit's proprietary allergy testing, and about "deals" and other agreements to spread Arrayit's proprietary allergy testing;

    e. Making false and misleading statements to investors about Arrayit's plans to list on the NASDAQ stock exchange;

    f. Making false and misleading statements to investors about Arrayit's capability to test for COVID-19, the accuracy of Arrayit's COVID-19 test, the status of its regulatory approval, and the

proliferation of Arrayit's COVID-19 testing technology;

        g.    Manipulating the price of Arrayit stock through stock transfers and trading activity, and concealing securities transactions made in furtherance of the scheme;

        h.    Conspiring to defraud Medicare, Medicaid, TRICARE, and the Commercial Insurers, as discussed in greater detail in paragraphs 36 through 49; and

        i.    Concealing from investors, through false and misleading statements and omissions of material fact, Arrayit's scheme to defraud Medicare, Medicaid, TRICARE, and the Commercial Insurers, and to illegally profit from the proceeds of illegal health care kickbacks and bribes.

32.    It was further a part of the scheme to defraud that SCHENA and others took the following actions, among others:

        a.    On or about November 19, 2018, SCHENA issued a press release falsely stating that pursuant to "an allergy testing agreement," Arrayit "is providing its proprietary microarray-based finger stick allergy testing services to Sutter Health via doctors in the Sutter Health-affiliated Palo Alto Medical Foundation," Sutter Health, "one of the nation's largest healthcare networks," reports "total patient service revenues of $12,000,000,000 annually."

        b.    On or about August 8, 2019, SCHENA posted from the Arrayit Twitter account that "Arrayit clinical team commences $240,000,000 test kit manufacturing run to build inventory for our rapidly expanding physician-ordered finger stick allergy testing services empowering clinic network doctors to identify, manage and treat allergy and asthma." This false and misleading tweet was subsequently repeated elsewhere, including on social media and investor-focused message boards.

        c.    In early 2020, as COVID-19 began to spread around the world, SCHENA and Arrayit began promoting a test for COVID-19 through its website. SCHENA attempted to exploit the pandemic by claiming that Arrayit could test dried blood samples for both allergens and COVID-19, and instructing its patient recruiters and clinics to add on or bundle Arrayit's allergy test and COVID-19 test regardless of medical necessity.

        d.    Between on or about March 19, 2020, and on or about March 21, 2020, SCHENA sent an email to dozens of investors who had inquired about the COVID-19 test. SCHENA's email stated: "*Dear Valued Customer, We received more than 50,000 requests for our finger stick blood test for SARS-*

*CoV-2, the virus that causes coronavirus disease 2019 (COVID-19). Our team is coordinating with local, state and federal agencies and with our distributors to make this test available to as many patients as possible on an expedited timeline. Please consult our website and press releases for updates. Best regards, Arrayit Corporation.*" These false statements were subsequently amplified on social media and reposted on investor-focused message boards.

COUNT ONE: (18 U.S.C. § 1349 – Conspiracy to Commit Health Care Fraud and Wire Fraud)

33. The factual allegations in Paragraphs 1 through 32 are re-alleged and incorporated by reference as if fully set forth herein.

34. Beginning in or around 2018, and continuing through in or around June 2020, in the Northern District of California and elsewhere, the defendant,

MARK SCHENA,

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate, and agree with others known and unknown to the Grand Jury to commit certain offenses against the United States, to wit:

    a. to execute a scheme and artifice to defraud health care benefit programs affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, Medicaid, TRICARE, and the Commercial Insurers, and to obtain by means of materially false and fraudulent pretenses, representations and promises, money and property owned by, and under the custody and control of, said health care benefit programs, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347.

    b. by devising a scheme and artifice to defraud as to a material matter and to obtain money by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing the scheme and artifice, to knowingly transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures or sounds, in violation of Title 18, United States Code, Section 1343.

Purpose of the Conspiracy

35. It was a purpose of the conspiracy for SCHENA and his co-conspirators to unlawfully

enrich themselves by: (a) submitting or causing the submission of false and fraudulent claims by interstate wire to Medicare, Medicaid, TRICARE, and the Commercial Insurers for services that were (i) procured by the payment of kickbacks and bribes; (ii) medically unnecessary; (iii) not eligible for reimbursement; and/or (iv) not provided as represented; (b) concealing the submission of false and fraudulent claims to Medicare, Medicaid, TRICARE, and the Commercial Insurers, and the receipt and transfer of the proceeds from the fraud; and (c) diverting proceeds of the fraud for their personal use and benefit, and to further the conspiracy.

<u>Manner and Means</u>

36.     SCHENA and his co-conspirators used the following manner and means, among others, to accomplish the object and purpose of the conspiracy.

37.     In or around May 2018, SCHENA and others announced that Arrayit had developed revolutionary new technology that allowed Arrayit to test for exposure to 120 common food and environmental allergens with only a single drop of blood from a finger stick sample.

38.     SCHENA and others would apply for and maintain various laboratory certifications from state and federal agencies, including from CLIA, that were necessary for Arrayit to legally conduct testing and submit claims to Medicare, Medicaid, TRICARE, and Commercial Insurers.

39.     SCHENA and others would submit or cause the submission of false and fraudulent attestations and other documents to state and federal regulators, including CLIA, that falsely certified the identity, roles, and responsibilities of Arrayit's laboratory director and other personnel, and concealed SCHENA's roles and responsibilities.

40.     SCHENA and others would submit and cause the submission of false and fraudulent enrollment applications on behalf of Arrayit to Medicare, Medicaid, TRICARE, and Commercial Insurers, in which Arrayit certified that payment of claims was conditioned upon the underlying claims complying with the federal anti-kickback statute, the applicable laws, regulations, and program instructions, and that Arrayit would not knowingly present or cause to be presented false or fraudulent claims.

41.     SCHENA and others paid and caused the offer and payment of illegal kickbacks and bribes to other individuals and purported marketing companies in exchange for blood samples collected from patients and orders for allergy testing from health care providers, all of which were used to support false

and fraudulent claims that were submitted by Arrayit and others to Medicare, Medicaid, TRICARE, and Commercial Insurers.

42. SCHENA and others distributed false and fraudulent marketing material and other documents that misrepresented the medical necessity of Arrayit's allergy test and Arrayit's ability to provide accurate, fast, and reliable allergy test results that would be medically necessary and reasonable in the treatment of the patient.

43. SCHENA and others caused Arrayit to test for 120 allergens regardless of the medical necessity, availability of the less expensive skin tests, reasonableness, rules against ordering the same test for each patient, or use of such testing in the treatment of each patient, in order to maximize the amount billed to Medicare, Medicaid, TRICARE, and the Commercial Insurers and allow SCHENA and others to issue positive financial projections for Arrayit that were deceptively based off the amount billed by Arrayit.

44. As the effects of the COVID-19 pandemic began to be felt in the United States and many patients faced difficulty obtaining access to COVID-19 testing, SCHENA and others used the COVID-19 pandemic as an opportunity to expand the pre-existing allergy test scheme and to capitalize on a national emergency for their own financial gain by offering COVID-19 testing and bundling the COVID-19 test with, i.e., requiring combination with, Arrayit's more expensive allergy testing, which did not identify or treat COVID-19.

45. SCHENA and others obtained fraudulent orders for allergy and COVID-19 testing by making false and fraudulent statements, directly and indirectly, to health care providers, patients, and others concerning Arrayit's ability to provide accurate, fast, and reliable COVID-19 testing in compliance with applicable state and federal regulations, and the purported need to bundle the COVID-19 test with Arrayit's allergy test, while concealing that, at various times, the Arrayit COVID-19 test had not been developed, validated, produced, received the requisite regulatory authorization, or able to return timely COVID-19 results as represented.

46. SCHENA and others entered into sham contracts and agreements, and created and maintained false and fraudulent invoices and other documents, in order to conceal and disguise the illegal kickbacks and bribes, as well as that the testing was not provided as billed to Medicare, Medicaid,

TRICARE, and the Commercial Insurers, including concealing the ordering physician, medical clinic, and/or laboratory that actually conducted the testing.

47. SCHENA and others caused Arrayit to submit approximately $69 million in claims by interstate wire to Medicare, Medicaid, TRICARE, and the Commercial Insurers for allergy tests that were obtained through illegal kickbacks and bribes, medically unnecessary, ineligible for reimbursement, and/or not provided as represented.

In violation of Title 18, United States Code, Section 1349.

COUNTS TWO THROUGH THREE: (18 U.S.C. § 1347 and 18 U.S.C. § 2 – Health Care Fraud)

48. The allegations in Paragraphs 1 through 32 and 36 through 47 are realleged and incorporated as if fully set forth here.

49. On or about the dates set forth below, in the Northern District of California and elsewhere, the defendant,

MARK SCHENA,

did knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud health care benefit programs as to a material matter and to obtain by means of materially false and fraudulent pretenses, representations, and promises, and by concealment of material facts, money and property owned by, and under the custody and control of, those health care benefit programs, all of the preceding in connection with the delivery of, and payment for, health care benefits, items, and services:

| COUNT | INSURED | INSURER | APPROXIMATE DATE OF SERVICE | SERVICES BILLED | APPROXIMATE AMOUNT BILLED |
|---|---|---|---|---|---|
| 2 | W.W. | Meritain Health | 5/1/20 | Allergy testing | $5,293.28 |
| 3 | T.M. | Medicare | 5/13/20 | Allergy testing | $5,293.28 |

Each count a separate offense, in violation of Title 18, United States Code, Sections 1347 and 2.

COUNT FOUR: (18 U.S.C. § 371 – Conspiracy to Pay Kickbacks)

50. The allegations in Paragraphs 1 through 32 are realleged and incorporated as if fully set forth here.

51. From in or around 2017, and continuing through in or around June 2020, in the Northern District of California and elsewhere, the defendant,

MARK SCHENA,

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate, and agree with others, known and unknown to the grand jury, to commit certain offenses against the United States, that is: to violate Title 18, United States Code, Section 220(a)(2)(A), by offering and paying remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind, to induce a referral of an individual to a laboratory, with respect to services covered by a health care benefit program in and affecting interstate commerce.

### Purpose of the Conspiracy

52. It was a purpose of the conspiracy for SCHENA and his co-conspirators to unlawfully enrich themselves by: (a) offering and paying kickbacks and bribes to induce the referral of members to Arrayit; (b) submitting or causing the submission of false and fraudulent claims to the Commercial Insurers for services that were procured by the payment of kickbacks and bribes; (c) concealing and causing the concealment of the submission of the kickbacks and bribes; and (c) diverting kickbacks and bribes, and the proceeds of the scheme, for their personal use and benefit, and to further the conspiracy.

### Manner and Means

53. The allegations in Paragraphs 37 through 47 are realleged and incorporated as if fully set forth here.

### Overt Acts

54. In furtherance of the conspiracy, and to accomplish its objects and purpose, at least one of the co-conspirators committed and caused to be committed, in the Northern District of California and elsewhere, at least one of the following overt acts, among others:

55. On or about December 16, 2019, MARK SCHENA and others caused illegal kickback and bribe, in the approximate amount of $19,289.74, to be paid to Marketer-1 in exchange for the referral of individuals to Arrayit.

56. On or about April 17, 2020, MARK SCHENA and others caused an illegal kickback and bribe, in the approximate amount of $6,650.58, to be paid to Marketer-1 in exchange for the referral of

individuals to Arrayit.

In violation of Title 18, United States Code, Section 371.

COUNTS FIVE THROUGH SIX: (18 U.S.C. § 220(a)(2)(A) and 18 U.S.C. § 2 – Illegal Kickbacks)

57. The allegations in Paragraphs 1 through 32, 36 through 47, and 54 through 56 are realleged and incorporated as if fully set forth here.

58. From in or around 2017, and continuing through in or around June 2020, in the Northern District of California and elsewhere, the defendant,

MARK SCHENA,

did knowingly and willfully offer, pay, and cause to be offered and paid, any remuneration, including any kickback, bribe, and rebate, namely, the payments specified as to each count below, directly and indirectly, overtly and covertly, in cash and in kind, to induce a referral of an individual to a laboratory, that is, Arrayit, with respect to services covered by a health care benefit program, each in and affecting interstate and foreign commerce.

| COUNT | RECIPIENT | APPROXIMATE DATE | AMOUNT |
|---|---|---|---|
| 5 | Marketer-1 | 12/16/19 | $19,289.74 |
| 6 | Marketer-1 | 4/17/20 | $6,650.58 |

Each count a separate offense, in violation of Title 18, United States Code, Sections 220(a)(2)(A) and 2.

COUNTS SEVEN THROUGH NINE: (15 U.S.C. §§ 78j & 78ff; 17 C.F.R. 240.10b-5; and 18 U.S.C. § 2 – Securities Fraud)

59. The allegations in Paragraphs 1 through 32 are realleged and incorporated as if fully set forth here.

60. On or about the dates set forth below, in the Northern District of California and elsewhere, the defendant,

MARK SCHENA,

willfully and knowingly, directly and indirectly, by the use of the means and instrumentalities of interstate

commerce, the mails, and the facilities of national securities exchanges, in connection with the purchase and sale of securities, did use and employ manipulative and deceptive devices and contrivances, and aided and abetted others known and unknown to the grand jury, in violation of Title 15, United States Code, Sections 78j and 78ff, Title 17, Code of Federal Regulations, Sections 240.10b5 and 240.10b5-2, and Title 18, United States Code, Section 2, by: (a) employing devices, schemes and artifices to defraud; (b) making, and causing others to make, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons; to wit, SCHENA used, and caused others to use, wires and the mails to issue false and misleading statements related to Arrayit securities in the manner, and on or about the dates listed, below:

| COUNT | DATE | DESCRIPTION |
|---|---|---|
| SEVEN | 11/19/18 | SCHENA press release about "an allergy testing agreement" with multibillion-dollar company in Palo Alto, California |
| EIGHT | 8/8/2019 | SCHENA tweet about "$240,000,000 test kit manufacturing run" disseminated to market |
| NINE | 3/19/20 | SCHENA emails to investors about demand for Arrayit's COVID-19 tests and coordination with government agencies |

Each count a separate offense, in violation of Title 15, United States Code, Sections 78j and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2.

FORFEITURE ALLEGATION: (18 U.S.C. §§ 981(a)(1)(C) & 982(a) & 28 U.S.C. § 2461 – Criminal Forfeiture)

61. The allegations in Paragraphs 1 through 60 are re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a), and Title 28, United States Code, Section 2461(c).

62. Upon conviction of any of the offenses alleged in Counts One through Nine, the defendant,

MARK SCHENA,

shall forfeit to the United States pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a), and Title 28, United States Code, Section 2461, any property, real or personal, which constitutes

or is derived from proceeds traceable to said violations, including but not limited to a sum of money equal to the total proceeds from the commission of said offense.

63. If, as a result of any act or omission of the defendant, any of said property

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to or deposited with a third person;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property, which cannot be divided without difficulty;

the United States shall be entitled to forfeiture of substitute property, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), and Title 28, United States Code, Section 2461(c).

All pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a), and Title 28, United States Code, Section 2461.

DATED: May 18, 2020                                         A TRUE BILL

                                                               /s/
                                          FOREPERSON

STEPHANIE HINDS
Acting United States Attorney

DANIEL KAHN
Acting Chief, Fraud Section

   /s/
_____
WILLIAM FRENTZEN
Assistant United States Attorney

   /s/
_____
JACOB FOSTER
JUSTIN WEITZ
Assistant Chiefs
Fraud Section, Criminal Division

SUPERSEDING INDICTMENT                16

AO 257 (Rev. 6/78)

SEALED BY ORDER OF THE COURT

| | |
|---|---|
| **DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT** | |

BY: ☐ COMPLAINT ☐ INFORMATION ☐ INDICTMENT ☒ SUPERSEDING

Name of District Court, and/or Judge/Magistrate Location
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

**OFFENSE CHARGED**
Please see attached addendum.

☐ Petty
☐ Minor
☐ Misdemeanor
☒ Felony

PENALTY: Please see attached addendum.

**DEFENDANT - U.S**
▶ MARK SCHENA

DISTRICT COURT NUMBER
CR 20-00425-EJD

FILED
May 18 2021
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

**PROCEEDING**
Name of Complaintant Agency, or Person (& Title, if any)
HHS-OIG; FBI; VA-OIG; USPIS; DCIS

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40. Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
☐ U.S. ATTORNEY ☐ DEFENSE

SHOW DOCKET NO.

☐ this prosecution relates to a pending case involving this same defendant

☒ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under

MAGISTRATE CASE NO.
20-mj-70721

**DEFENDANT**
IS *NOT* IN CUSTODY
Has not been arrested, pending outcome this proceeding.
1) ☐ If not detained give date any prior summons was served on above charges ▶

2) ☐ Is a Fugitive

3) ☒ Is on Bail or Release from (show District)
Northern District of California

**IS IN CUSTODY**
4) ☐ On this charge

5) ☐ On another conviction ☐ Federal ☐ State

6) ☐ Awaiting trial on other charges
If answer to (6) is "Yes", show name of institution

Has detainer been filed? ☐ Yes ☐ No
If "Yes" give date filed

DATE OF ARREST ▶ Month/Day/Year
Or... if Arresting Agency & Warrant were not
DATE TRANSFERRED TO U.S. CUSTODY ▶ Month/Day/Year

Name and Office of Person Furnishing Information on this form
STEPHANIE HINDS
☒ U.S. Attorney ☐ Other U.S. Agency

Name of Assistant U.S. Attorney (if assigned)
William Frentzen

☐ This report amends AO 257 previously submitted

**ADDITIONAL INFORMATION OR COMMENTS**

PROCESS:
☐ SUMMONS ☒ NO PROCESS* ☐ WARRANT
If Summons, complete following:
☐ Arraignment ☐ Initial Appearance
Defendant Address:

Bail Amount:

* Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment

Date/Time: Before Judge:

Comments:

**Counts and Maximum Penalties:**

**COUNT ONE: 18 U.S.C. §§ 1349 - Conspiracy to Commit Health Care Fraud**

Penalties: Not more than 20 years imprisonment, not more than $250,000 fine, not more than 3 years supervised release and $100 assessment.

**COUNT TWO AND THREE: 18 U.S.C. § 1347 and 18 U.S.C. § 2 – Health Care Fraud**

Penalties: Not more than 10 years imprisonment, not more than $5,000,000 fine, not more than 3 years supervised release and $100 assessment.

**COUNT FOUR: 18 U.S.C. § 371 – Conspiracy to Pay Kickbacks**

Penalties: Not more than 5 years imprisonment, not more than $250,000 fine, not more than 3 years supervised release, $100 assessment.

**COUNTS FIVE THROUGH SIX: (18 U.S.C. § 220(a)(2)(A) and 18 U.S.C. § 2 – Illegal Kickbacks**

Penalties: Not more than 10 years imprisonment, not more than $200,000 fine, not more than 3 years supervision, $100 assessment.

**COUNTS SEVEN THROUGH NINE: (15 U.S.C. §§ 78j & 78ff; 17 C.F.R. 240.10b-5; and 18 U.S.C. § 2 – Securities Fraud**

Penalties: Not more than 20 years imprisonment, not more than $5,000,000 fine, not more than 3 years supervision, and $100 assessment.